# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 3958 | **DATE** | 8/22/2002 |
| **CASE TITLE** | JAMES McGREAL vs. DR. ERIC OSTROV, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____ .

(3)  ☐  Answer brief to motion due_____ . Reply to answer brief due_____ .

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____ .

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .

(7)  ☐  Trial[set for/re-set for] on _____ at _____ .

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]   The renewed motion for summary judgment of the individual defendants is granted.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 23 2002 | 104 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | | |
| EF | courtroom deputy's initials | | date mailed notice | |
| | | | mailing deputy initials | |

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



DOCKETED

AUG 2 3 2002

JAMES McGREAL,                    )
                                  )
            Plaintiff,            )
                                  )        No. 98 C 3958
      vs.                         )
                                  )        HONORABLE CHARLES R. NORGLE
DR. ERIC OSTROV; VILLAGE OF       )
ALSIP; KENNETH WOOD, Alsip Police )
Chief; and DAVID SNOOKS,          )
Alsip Police Lieutenant,          )
                                  )
            Defendants.           )

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the court is the renewed motion for summary judgment of the individual Defendants,

Alsip Police Chief Kenneth Wood ("Chief Wood") and Alsip Police Lieutenant David Snooks ("Lt.

Snooks). For the following reasons, the motion is granted.

## I.  BACKGROUND

James McGreal is a veteran patrol officer with the Village of Alsip, a south suburb of

Chicago. McGreal brought this suit under 42 U.S.C. § 1983 complaining of alleged employment

retaliation he claims to have suffered at the hands of Chief Wood and Lt. Snooks. McGreal claims

that the retaliation occurred after he made an unsuccessful election bid for mayor of Alsip, and spoke

about a number of issues involving illegal gambling, liquor licenses, the incumbent mayor of Alsip,

the Alsip Police Department, local prosecutors, and a State of Illinois judge. The court outlines the

relevant facts below.

104

McGreal's outspokenness revolved around a few central issues: (1) McGreal's official and unofficial inquiries about the liquor license of a local nightclub; (2) a complaint McGreal filed with the Illinois Judicial Inquiry Board concerning what McGreal perceived to be the lenient prosecution of a D.U.I. charged against the son of a local prosecutor; (3) McGreal's election bid and public criticism of the incumbent mayor of Alsip; and (4) gambling at the local Elks Club.

In August 1994, McGreal encountered a man by the name of John Hernandez. During a conversation between McGreal and Hernandez, Hernandez claimed to be a part owner of an Alsip nightclub called the Copacabana Lounge, or "the Copa." Later, McGreal ran a criminal history check on Hernandez, which showed drug arrests in 1991 and 1993. McGreal could not obtain the dispositions of the cases, and never asked Hernandez. McGreal submitted a report about Hernandez's possible ownership interest in the Copa, and informed Chief Wood that ownership of a bar by a felon violates Illinois statutes and local Alsip ordinances. McGreal requested an official investigation into the situation.

Chief Wood reviewed McGreal's report, and assigned Sgt. Murray to do a follow-up investigation into Hernandez and the Copa. Hernandez repeated to Sgt. Murray the claim of an ownership interest in the Copa. Sgt. Murray prepared a two page report indicating that he agreed with McGreal's recommendation that charges should be brought against the Copa before the Liquor Commission. Chief Wood was unsatisfied with the completeness of Sgt. Murray's report, and returned it to him with orders to obtain additional evidence or to reach a different conclusion. Sgt. Murray's response to Chief Wood was to resubmit his report with the same page one, but with a different page two. The new page two contained only a single sentence indicating that no further action would be taken.

2

Approximately nine months later, McGreal inquired of Sgt. Murray and Chief Wood as to what had happened to Sgt. Murray's report. Not satisfied with whether work was still being done by his superior officers, McGreal pulled the case file from the Records Section. The file was incomplete, as it only included the two pages of McGreal's report; neither the computer printouts nor Sgt. Murray's follow-up reports were in the file.

On June 17, 1995, McGreal sent directly to Chief Wood a memo explaining that Sgt. Murray's reports were missing from the file. Approximately ten days after submitting this memo, McGreal received an envelope from Chief Wood, which contained McGreal's initial two-page report and a new typewritten report from Sgt. Murray. The new typewritten report contained no date, but the case file number contained a handwritten strikeover from '95 to '94. McGreal believed that the strikeover was evidence that the report might have been authored in response to his request for investigation. McGreal dropped the issue because he had no proof of any misconduct by his superior officers and nothing to support his suspicions.

In the Fall of 1996, McGreal returned to the issue of Hernandez's alleged ownership of the Copa. McGreal was directed to the Liquor Commission file, where he found photocopies of both versions of Sgt. Murray's report. At that time, McGreal specifically brought Sgt. Murray's reports directly to Chief Wood's attention. Unsatisfied with Chief Wood's response, McGreal commenced his own unofficial investigation into the matter by contacting Assistant Attorney General Feldmeier ("A.G. Feldmeier"). During that conversation, McGreal said he was an Alsip police officer, and A.G. Feldmeier came away with the impression that McGreal was conducting an official investigation.

While still a patrol officer, in January of 1997 McGreal announced his intention to run for mayor of Alsip. McGreal made statements to the local press about the incumbent mayor, Mayor Andrews. McGreal was critical of Mayor Andrews' position as liquor commissioner, and Mayor Andrews' performance in that position. McGreal also made public statements about the purportedly missing confidential police files, i.e., Sgt. Murray's report and the re-drafted report concerning the Copa and Hernandez's possible ownership interest therein. During the same month, McGreal personally filed an appeal with the State of Illinois Liquor Control Commission protesting the Copa's liquor license. McGreal's appeal detailed several instances of problems at the Copa, and raised concerns that Mayor Andrews conducted himself improperly in his dealings with the Copa.

In March 1997, A.G. Feldmeier faxed to the Alsip police station a report stating that Hernandez's girlfriend believed that Hernandez had bought part ownership of the Copa. Chief Wood received the faxed report and then called A.G. Feldmeier for more information. A.G. Feldmeier's fax caught Chief Wood by surprise because Chief Wood did not know, and was not informed by McGreal, that McGreal was conducting his own unofficial investigation into the Copa. Chief Wood was concerned that McGreal's unofficial investigation could have caused problems within the Alsip Police Department and with other law enforcement agencies. While this was going on, McGreal was a candidate for public office and a patrol officer.

The Alsip mayoral election was held on April 1, 1997. Mayor Andrews defeated McGreal by several hundred votes.

On August 16, 1997, McGreal was summoned to the scene of a one car accident, where he arrested Sean Taylor for driving under the influence of alcohol. Taylor is the son of a local prosecutor. On September 17, 1997 McGreal arrived at the initial court date for Sean Taylor's D.U.I.

4

case. After checking the computer docketing system, McGreal learned the case had been rescheduled to August 27, 1997, a date on which McGreal had not been subpoenaed to appear. McGreal would later return to issues arising out of Taylor's D.U.I. case.

In early September 1997, McGreal attended a little league baseball function at the local Elk's club, where he saw evidence of video poker gambling. Specifically, McGreal noted the number of machines, their popularity, and the presence of "reset" switches on the machines, all of which are usually associated with gambling. McGreal wrote a memorandum raising the possibility of gambling, and also mentioned a rumor that an unnamed Alsip Village official received a percentage of the revenue produced by the video poker machines. On September 22, 1997, Lt. Snooks sent McGreal a memo stating that the allegations raised were very serious and McGreal needed to divulge the identity of the unnamed Alsip official before an investigation could commence. McGreal responded that same day, informing Lt. Snooks that the official rumored to be involved in the Elk's Club gambling was Mayor Andrews. McGreal, however, had no personal knowledge of the alleged kickbacks to Mayor Andrews, nor did he have any evidence to support the rumor.

In early October 1997, Chief Wood contacted a Cook County law enforcement agency and requested them to investigate the Elk's club. By the end of October, the County completed their investigation and confirmed that gambling was indeed occurring. The County said that their investigation was closed, and that they would not investigate the rumors that Mayor Andrews was receiving illegal kickbacks from the gambling.

Also in early October 1997, McGreal sent his supervisors a memo explaining the circumstances around the Sean Taylor D.U.I. case, and concluded that the disposition and handling of the case were deserving of inquiry. Lt. Snooks responded to McGreal's memo with a memo of

his own, stating that he (Lt. Snooks) and Assistant State's Attorney Jim McCarter looked at the computerized records from the case. The records showed a plea of guilty to one charge, that Taylor had received 18 months supervision, and that the other charges were stricken as standard procedure. McCarter and Lt. Snooks both concluded that the actions of the involved parties were properly explained and the handling of the case was lawful and proper. In fact, the information that Lt. Snooks conveyed to McGreal was inaccurate, as Taylor actually received 12 months supervision along with several additional sanctions. McGreal learned of Taylor's true sentence in October when McGreal did a follow up check of the records.

As the arresting officer, McGreal was not satisfied with the disposition of Taylor's D.U.I. and related tickets. On November 3, 1997 McGreal sent a formal complaint to the Illinois Judicial Inquiry Board complaining about the presiding judge, Judge Sterba. McGreal compared Taylor's D.U.I. case to the corruption that led to Operation Greylord.[1] McGreal said that the handling of the case and the fact that Taylor is the son of a local prosecutor led him to believe that there was intentional misconduct. McGreal implied that the discrepancy between the sentence Lt. Snooks reported and what McGreal's own investigation showed was an official change in Taylor's sentence that occurred as a result of McGreal's call for inquiry into the matter.

In early November 1997, Chief Wood spoke with the State Public Integrity Task Force about investigating the possibility of Mayor Andrew's involvement in the gambling at the Elk's Club, and the Task Force initiated an investigation. Mayor Andrews learned of the investigation, and on November 10th, learned that McGreal was the source of information that triggered the investigation.

---

[1] Operation Greylord was a federal investigation into widespread corruption in the Circuit Court of Cook County, which led to the prosecutions and convictions of numerous lawyers and judges.

The State Public Integrity Task Force investigation eventually concluded that the rumors reported by McGreal about Mayor Andrews being paid a portion of the illegal gambling proceeds were unfounded.

Beginning on November 10, 1997, McGreal claims that Defendants began a pattern of retaliation against him. McGreal asserts that: the Village hired an attorney with the reputation of a "headhunter" to terminate McGreal's employment; Chief Wood and Lt. Snooks conducted a lengthy investigation of McGreal to find cause for termination; McGreal was ordered to submit to psychological examination and undergo therapy or be terminated; and McGreal was placed on indefinite medical leave pursuant to the psychologist's report.

In response to the alleged retaliation, McGreal filed this suit claiming that he is entitled to relief under 42 U.S.C. § 1983. After earlier rulings by the court and voluntary action by McGreal, the only portions of the suit still pending are the claims against Chief Wood and Lt. Snooks in their individual capacity.

Earlier in the litigation, Chief Wood and Lt. Snooks moved for summary judgment, arguing that McGreal's speech was not of public concern, and even if it were, Defendants' interest in maintaining order and discipline outweighed McGreal's free speech rights. Alternatively, Chief Wood and Lt. Snooks argued that they were entitled to qualified immunity. The court denied the motion, finding that although these were questions of law for the court to decide, there were factual questions surrounding the issues that precluded summary judgment. (See R. 73.)

Since that time, the Supreme Court decided Saucier v. Katz, 121 S. Ct. 2151 (2001), and the parties submitted the final pre-trial order. After reviewing the final pre-trial order in light of Saucier,

the court struck the trial date and invited Chief Wood and Lt. Snooks to submit this motion addressing, *inter alia*, qualified immunity.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High School Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999). Indeed, a party opposing summary judgment must do more than raise a "metaphysical doubt" as to the material facts. See Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1139 (7th Cir. 1997) (citing Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1355-56 (1986)). Summary judgment is appropriately entered against a party that fails to demonstrate the existence of an essential element of that party's case. See Gleason 118 F.3d at 1139 (citing cases). Put another way, summary judgment is the stage of a lawsuit where a party must present evidence that could convince a trier of fact to accept his version of events. See Shank v. William R. Hague, Inc., 192 F.3d 675, 682 (7th Cir. 1999) (citing Schacht v. Wisconsin Dep't of Corrections, 175 F.3d 497, 503-04 (7th Cir. 1999)). In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c), see also Perdomo v. Browner, 67

8

F.3d 140, 144 (7th Cir. 1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## B.    Qualified Immunity:

Saucier recently reiterated that qualified immunity is a two step analysis. See 121 S. Ct. at 2156. The first step is to determine if there is a constitutional violation present on the facts alleged, when those facts are construed most favorably to the party asserting the injury. See id. If the plaintiff presents a constitutional injury, the second step is to determine whether the right was clearly established at the time. See id. The second step "must be undertaken in light of the specific context of the case, not as a general proposition. . . ." Id. In other words, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 121 S. Ct. at 2156 (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)). "[T]he right allegedly violated must be defined at an appropriate level of specificity before a court can determine if it was clearly established." Saucier, 121 S. Ct. at 2156 (quoting Wilson, 526 U.S. at 615). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [official] conduct. . . . Saucier, 121 S. Ct. at 2158. "If the [official's] mistake as to what the law requires is reasonable. . .the [official] is entitled to the immunity defense." Id. The court addresses each of the qualified immunity inquiries in turn.

9

### 1. Constitutional Violation:

The first step in this case is complicated by the fact that McGreal is a governmental employee claiming a violation of his First Amendment rights. See e.g. Kinney v. Weaver, – F.3d –, No. 00-40557, 2002 WL 1764145, at *13-21 (5th Cir. July 31, 2002) (engaging in a Pickering-Connick First Amendment analysis as the first step in a qualified immunity question); Gragg v. Kentucky Cabinet for Workforce Dev., 289 F.3d 958, 964-68 (6th Cir. 2002) (same). The court first addresses the rules governing First Amendment claims by governmental employees, and then analyzes this case under that framework.

"There are four elements to a First Amendment retaliation claim in the employment context." Gustafson v. Jones, 290 F.3d 895, 906 (7th Cir. 2002). First, the plaintiff must demonstrate that the speech was of public concern, id., meaning speech relating to "'any matter of political, social, or other concern to the community.'" Gragg, 289 F.3d at 965 (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). Then, the plaintiff must prove that the speech played a substantial part in the employer's decision to take an adverse employment action against the plaintiff. Gustafson, 290 F.3d at 906. If the plaintiff successfully carries these two points, the burden shifts to the defendant to demonstrate that the government's interest as an employer outweighs the employee's free speech rights, or that the employer would have taken the same actions absent the speech at issue. Id. In the case at bar, there are factual disputes concerning whether McGreal's speech played a substantial part in the Village's decision to take steps to terminate him, and whether the Village would have taken the same steps absent the speech. For the purposes of this opinion, the court assumes that McGreal is successful on both of these points, and analyzes the case on the issues of whether McGreal spoke

about matters of public concern and whether Defendants' interest as his employer outweighed McGreal's interest in his speech.

In Board of Cty Comm'rs., Wabaunsee Cty. Kan. v. Umbehr, 518 U.S. 668, 679 (1996), the Supreme Court held that the First Amendment provides no absolute guarantee of freedom of speech, rather, it "protects government employees from termination because of their speech on matters of public concern." Id. (citing Connick, 461 U.S. at 146). "To prevail, an employee must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination." Wabaunsee County, 518 U.S. at 679. Moreover, even if a defendant clears the "constitutionally protected activity" hurdle, "termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong." Id.; see also Marshall v. Allen, 984 F.2d 787, 797 n. 8 (7th Cir.1993). When examining allegations of such a termination, "[g]overnment employees' First Amendment rights depend on the balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Wabaunsee County, 518 U.S. at 680 (citing Pickering v. Board of Educ., 391 U.S. 563, 568 (1968)). "The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." Waters v. Churchill, 511 U.S. 661, 675 (1994) (plurality opinion approved by seven Justices).

In addition, the Seventh Circuit recently summarized the Pickering analysis this way:

> In Pickering v. Board of Education, 391 U.S. 563 (1968), the Court set out a two-pronged balancing test to determine whether a public employee's First Amendment rights have been violated. First, it must be determined whether the speech (or association) is on a matter of public concern. If it is, then the court must balance the interest of the public employee, as a citizen, in commenting upon matters of public concern with the interest of the government, as the employer, in promoting the efficiency of the public services it provides.

Klug v. Chicago Sch. Reform Bd. of Trustees, 197 F.3d 853, 857 (7th Cir.1999); see also Weicherding v. Riegel, 160 F.3d 1139, 1142 (7th Cir.1998); Messman v. Helmke, 133 F.3d 1042, 1045 (7th Cir.1998). As Wabaunsee County illustrates, "an employee must prove that the conduct at issue was constitutionally protected" before undertaking a Pickering balancing. 518 U.S. at 679. Only after an employee clears the "constitutionally protected activity" hurdle does a court address whether the employee's termination because of protected speech was justified by legitimate countervailing government interests. See id.; see also Button v. Kibby-Brown, 146 F.3d 526, 528 (7th Cir.1998) (noting that the court is to decide as a matter of law whether a public employee's speech is protected).

If the plaintiff demonstrates protected speech, then the court must balance the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. See Klug, 197 F.3d at 857; see also Feldman v. Ho, 171 F.3d 494, 497 (7th Cir.1999) (stating that where "speech proves excessively disruptive of an employer's mission, then the employer may respond."); Weicherding, 160 F.3d at 1142. The relevant factors to consider in performing the balancing are: "(1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and

12

confidence are necessary; (3) whether the speech impeded the employee's ability to perform [his] responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6)whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public." Gustafson v. Jones, 290 F.3d 895, 909 (7th Cir. 2002); see also Kokkinis v. Ivkovich, 185 F.3d 840, 845 (7th Cir. 1999). The court addresses both of these prongs below.

### a. Protected Speech:

McGreal asserts that his speech concerned matters of public corruption, and is to be accorded the highest protections of the First Amendment. As a general proposition, McGreal is correct. "Protection of speech critical of public officials' exercise of their powers is an integral part of the 'public debate' that the First Amendment protects." Kinney, 2002 WL 1764145, at *19; see also Myers v. Hasara, 226 F.3d 821, 826 (7th Cir. 2000) (noting the necessity that governmental employees are free to expose official misconduct and that protecting such employees from retaliation "lies at the heart of the Pickering cases, and at the core of the First Amendment."); Jefferson v. Ambroz, 90 F.3d 1291, 1298-99 (7th Cir. 1996) (Rovner, J., concurring, noting that speech that accurately exposes public impropriety or misconduct receives the highest protection); cf. Gonzalez v. City of Chicago, 239 F.3d 939, 941 (7th Cir. 2001) (dicta noting that a civilian police employee would have the First Amendment right to speak as a citizen about police corruption). But, the fact that a governmental employee speaks about issues that may be considered public concern does not automatically mean that the speech is protected. See Kokkinis, 185 F.3d at 844. The "public concern" determination must be made with specificity in the context of the case at hand, see Saucier 121 S. Ct. at 2158, and the issue depends on "'the content, form, and context of [the speech] as

13

revealed by the whole record.'" Gustafson, 290 F.3d at 906-07 (quoting Connick, 461 U.S. at 147-48, brackets in Gustafson). The court is to examine whether the employee's purpose was to bring wrongdoing to light and raise public awareness, or to further some personal interest of the employee. Kokkinis, 185 F.3d at 844; compare Wales v. Board of Educ. of Comm. Unit Sch., 120 F.3d 82, 84-85 (7th Cir. 1997) (discussing the difficulty of characterizing speech as "public" or "private").

McGreal spoke about public corruption, in the form of Mayor Andrews possibly accepting bribes from the Elk's club gambling, the perceived lenient treatment of Sean Taylor in his D.U.I. prosecution, and possible misfiling or alteration of Sgt. Murray's report about the Copa's ownership and liquor license. Chief Wood and Lt. Snooks assert that they investigated, or caused to be investigated, McGreal's allegations and found them to be false. Specifically, the State Public Integrity Task Force dispelled as unfounded the rumor about Mayor Andrews receiving kickbacks. As for Sgt. Murray's missing Copa reports, Lt. Snooks found the reports in the file after McGreal told Lt. Snooks that the reports had been missing. Even McGreal found the purportedly missing reports in the Liquor Commission files. Chief Wood and Lt. Snooks also point out that McGreal filed Judicial Inquiry Board complaint about Judge Sterba without fully investigating the circumstances. McGreal's letter highlighted the differences between the sentence that Sean Taylor actually received and the one that Lt. Snooks related to McGreal. McGreal then drew the inference that these differences were in response to McGreal's initial inquiries into the matter, instead of a simple mistake on the part of Lt. Snooks.

Chief Wood and Lt. Snooks argue that McGreal's speech was motivated by personal interests in making these statements, and therefore the First Amendment does not protect the speech. See e.g. Kokkinis, 185 F.3d at 844-45 (holding that public speech motivated by personal displeasure with

14

policies was not covered by the First Amendment).  For example, Chief Wood and Lt. Snooks submit that McGreal's communication of the rumor that Mayor Andrews was on the take came six months after McGreal lost the mayoral election.  Similarly, Defendants assert that McGreal's public statements about Sgt. Murray's Copa reports being missing came during McGreal's election campaign, and were McGreal's attempt to mislead the public instead of stirring public debate.  Finally, Chief Wood and Lt. Snooks assert that McGreal filed his complaint about Judge Sterba with the Judicial Inquiry Board shortly after Judge Sterba criticized McGreal's testimony in an unrelated D.U.I. trial.  Defendants point out that McGreal prepared the Judicial Inquiry Board complaint without getting the facts straight, and further assert that McGreal leapt to conclusions about the information he received from Lt. Snooks.  Chief Wood and Lt. Snooks portray McGreal as a vindictive employee pursuing his own personal interests rather than truly bringing official misconduct to light.

In response, McGreal asserts that his report about possible gambling at the Elk's club turned out to be accurate, as confirmed by a County investigation.  While illegal gambling is of course a matter of public concern, McGreal myopically focuses on this issue, and figuratively claims that no good deed goes unpunished.  However, there is no evidence that Defendants retaliated against McGreal for discovering the Elk's club gambling.  The evidence shows that Defendants took the steps against McGreal in response to his public speech about other issues, namely the Judicial Inquiry Board complaint, the rumors about Mayor Andrews, and the statements about Sgt. Murray's Copa reports.  The core issue in the suit is whether Defendants' actions in response to that speech violated McGreal's First Amendment rights.

15

Other than McGreal's assertion that he uncovered the Elk's club gambling, McGreal offers little in response to Chief Wood and Lt. Snook's argument that he was motivated by personal concerns. Instead, McGreal belabors Defendants' actions against him, and claims that the acts were blatant retaliation.

Nevertheless, liberally construing all of the facts and inferences in McGreal's favor, the court assumes that McGreal spoke about matters of public concern. The court cannot overlook the strong interest in preserving the right of governmental employees to expose corruption without the fear of losing their jobs. Of course, this right is not absolute. Government employees are not entitled to spread rumors or falsehoods in the name of whistle blowing if they are truly furthering personal grievances against superiors. See Kokkinis, 185 F.3d at 844; see also Wales, 120 F.3d at 84-85 (noting that Supreme Court precedent optimistically indicates that courts can discern public and private speech at low cost). Citizens must be free to speak publicly about official misconduct and corruption, see Myers, 226 F.3d at 821; Jefferson, 90 F.3d at 1298-99 (Rovner, J., concurring), and the cold record of this case makes it difficult to determine whether McGreal was the vindictive employee portrayed by Defendants or was honestly trying to expose what he perceived as misconduct. See Wales, 120 F.3d at 84-85; cf. Gustafson, 290 F.3d at 909-12 (reviewing a jury's findings). As this case is on summary judgment, and the court must construe factual inferences and disputes in McGreal's favor, the court assumes that McGreal was speaking as a concerned citizen, and not as a disgruntled employee.

**b.   Pickering Balancing:**

The next step is to balance McGreal's First Amendment rights against the Village's need to operate the Alsip Police Department in an efficient manner. Police Departments, as paramilitary

16

organizations, have a strong interest in curtailing potentially disruptive speech. See Gustafson, 290 F.3d at 910; Kokkinis, 185 F.3d at 845-46; cf. Driebel v. City of Milwaukee, – F.3d –, No. 01-1689, 2002 WL 1734023, at * 10 (7th Cir. July 29, 2002). The need for close teamwork and esprit de corps in the field of law enforcement means that speech that might not interfere with less demanding work environments takes on far greater implications in a police department. See Kokkinis, 185 F.3d at 845. Thus, a police department has a far greater interest in regulating the speech of its employees than a typical government employer has. See id. (quoting Tyler v. City of Mountain Home, 72 F.3d 568, 570 (8th Cir. 1995)). This interest promotes internal efficiency, loyalty, and morale, as well as instilling public confidence in law enforcement. See Kokkinis, 185 F.3d at 845 (quoting Tyler, 72 F.3d at 570); cf. Gustafson, 290 F.3d at 910 (citing Waters, 511 U.S. at 677); Driebel, 2002 WL 1734023, at *10 (noting that in police departments, like all paramilitary organizations, it is imperative that officers follow internal rules). Police departments "'are given more latitude in their decisions regarding discipline and personnel regulations than an ordinary government employer.'" Kokkinis, 185 F.3d at 845 (quoting Tindle v. Caudell, 56 F.3d 966, 971 (8th Cir. 1995)). The standard is *potential* disruption to the police department, not actual disruption. See Gustafson, 290 F.3d at 910; Kokkinis, 185 F.3d at 845-46. There is no requirement that a police department wait for actual harm to occur before curtailing speech. See Kokkinis, 185 F.3d at 845. The court is to give considerable, but not complete, deference to the judgment of police officials in determining the potential disruptive effect that an officer's speech may have. Gustafson, 290 F.3d at 910; Kokkinis, 185 F.3d at 845-46.

In this case, both Chief Wood and Lt. Snooks were of the opinion that McGreal's speech on several matters had the potential to disrupt the Alsip Police Department and its relationship with

other law enforcement agencies, prosecutors, and the courts. For example, Chief Wood was of the opinion that McGreal jeopardized relationships between the Alsip Police Department and other law enforcement agencies when McGreal identified himself as a police officer to A.G. Feldmeier when McGreal conducted his own investigation into the ownership of the Copa. A.G. Feldmeier was under the impression that McGreal was conducting an official investigation, and used her resources to assist with that investigation - something A.G. Feldmeier told Chief Wood she would not have done if she knew McGreal was acting on his own. Chief Wood also believed that McGreal was wrong to submit the Judicial Inquiry Board complaint about Judge Sterba without confirming all the facts beforehand. Finally, Chief Wood believed that McGreal's repetition of the rumor about Mayor Andrews being paid from the illegal gambling at the Elk's club was nothing more than a rumor intended to discredit Mayor Andrews. The rumor caused the Alsip Police Department to contact the Illinois State Public Integrity Task Force to investigate the issue, which eventually determined the rumor to be unfounded. Similarly, Lt. Snooks was concerned that McGreal's complaint to the Judicial Inquiry Board may have jeopardized the relationship between the Alsip Police Department and the State's Attorney Office. McGreal's complaint accused Judge Sterba and local prosecutors of corruption on the scale of what was uncovered in the infamous Operation Greylord investigation. These facts demonstrate legitimate concerns on the part of Chief Wood and Lt. Snooks that McGreal's conduct could upset the mission of the Alsip Police Department.

At this point, the court must comment about McGreal's comparison between the Taylor D.U.I. disposition and Operation Greylord. Judge Sterba sentenced Taylor to twelve months court supervision and additional sanctions. An Illinois statute permits court supervision as a sanction for D.U.I. violations. See 730 ILCS 5/5-6-3.1; see also United States v. Stowe, 989 F.2d 261, 262-63

18

(7th Cir. 1993) (noting Illinois law to the effect that successful completion of court supervision is deemed an adjudication without guilt). It is not unusual for Illinois judges to impose court supervision in such cases. See e.g. Stowe, 989 F.2d at 262-63 (analyzing an argument that successful completion of court supervision for a D.U.I. offense equals expungement of the offense for federal sentencing purposes); Toia v. People, – N.E.2d –, No. 1-00-3999, 2002 WL 1842219 (Ill. App. Ct. 2002) (analyzing a petition to expunge a D.U.I. conviction where the petitioner received one year court supervision and additional sanctions); People v. Herring, 762 N.E.2d 1186 (Ill. App. Ct. 2002) (affirming the conviction where the defendant received 12 months supervision and a monetary fine for D.U.I.); People v. Rozborski, 751 N.E.2d 644 (Ill. App. Ct. 2001) (analyzing a post-conviction petition of a person that received one year supervision for D.U.I.). Operation Greylord, on the other hand, was widespread nefarious corruption involving crooked lawyers and judges who exchanged bribe money for acquittals in cases ranging from traffic tickets to murder. The cases are disturbing and numerous. See e.g. United States v. Maloney, 71 F.3d 645 (7th Cir. 1995); United States v. LeFevour, 798 F.2d 977 (7th Cir. 1986); United States v. Devine, 787 F.2d 1086 (7th Cir. 1986); United States v. Murphy, 768 F.2d 1518 (7th Cir. 1985). The repercussion of the corruption extends well beyond the prosecutions of corrupt judges and lawyers, as questions remain about the convictions of persons convicted in trials where corrupt judges presided. See e.g. Bracy v. Gramley, 117 S. Ct. 1793 (1997), appeal after remand, Bracy v. Schomig, 286 F.3d 406 (7th Cir. 2002). At least one of these judges had a reputation as a "hard line" prosecution-oriented judge, and the dispute still exists as to whether the judge engaged in compensatory bias in cases where he did not accept bribes in an effort to deflect suspicion that he was corrupt. See Bracy v. Schomig, 286 F.3d 406 (7th Cir. 2002). To accuse a prosecutor or judge of such depravity is a serious charge indeed, one that

19

undermines public confidence, and casts an unfair shadow over those that are wrongly accused. McGreal's accusation in this case was misinformed and not at all warranted by the arguably routine sentence Taylor received.

McGreal submits that there is no evidence of actual disruption in the Alsip Police Department or in its relations with other law enforcement agencies, judges, or the State's Attorney Office. This argument misses the mark, as the standard is *potential* disruption. Gustafson, 290 F.3d at 910; Kokkinis, 185 F.3d at 845. A police department is not required to wait until damage occurs before curtailing the speech of an employee. See Kokkinis, 185 F.3d at 845. Such a rule would severely limit the ability of law enforcement agencies to run a smooth operation, and could risk public safety. See e.g. Driebel, 2002 WL 1734023, at *10 (noting that police departments are the "first line of defense against lawlessness."); Kokkinis, 185 F.3d at 846 ("public safety depends on good order and discipline.").

McGreal also argues that Defendants are not automatically entitled to a favorable Pickering balancing simply because they are part of a police department. That is an accurate statement of the law, see Gustafson, 290 F.3d at 910, but is misplaced in this case. In Gustafson, the police department defendants lost the Pickering balancing test because they presented no evidence of either actual or potential disruption from the plaintiff's speech. See 290 F.3d at 910-12. Indeed, the Gustafson defendants testified that the plaintiff's speech neither caused disruption nor had the potential of causing disruption. See id. Thus, the defendants failed to carry their burden of demonstrating that their interests in efficient governmental operations outweighed the plaintiffs' free speech rights. Id. A case in contrast is Kokkinis, where the Seventh Circuit found that there was

sufficient evidence of potential disruption by the plaintiff's speech to weigh in favor of the government's interests. 185 F.3d at 846.

What Gustafson and Kokkinis teach is that evidence of actual or potential disruption is necessary to tip the Pickering balancing test in favor of the government. "Pickering balancing is not an exercise in judicial speculation." Gustafson, 290 F.3d at 909. The court is to examine the record for evidence of potential or actual disruption, but not engage in excessive Monday morning quarterbacking of a police official's determination that potential disruption was present. See id. at 909-12; Kokkinis, 185 F.3d at 845-46. Here, the record demonstrates that Chief Wood and Lt. Snooks perceived potential disruption from McGreal's conduct. In light of the need for structure, loyalty, and harmony in a police department, that potential disruption is sufficient to tip the Pickering scale in favor of Chief Wood and Lt. Snooks.

Having found that Chief Wood and Lt. Snooks have carried their burden under the Pickering test, they are entitled to qualified immunity. See e.g. Gragg, 289 F.3d at 965-66 (holding that the defendants were entitled to qualified immunity where the plaintiff failed to demonstrate that speech was public concern). Typically, this would end the analysis, but out of an abundance of caution, the court will continue to determine whether the law was clearly established.

**2. Clearly Established Law:**

Chief Wood and Lt. Snooks are also entitled to qualified immunity because the law surrounding McGreal's claim was not clearly established at the time of the events. On this point, the Supreme Court's Saucier analysis is critical. The court is to examine whether the law was clearly

established, not as a general proposition, but in the specific context of the case at hand.[2] See Saucier, 121 S. Ct. at 2156. The court must determine whether it would be clear to a reasonable officer that the adverse actions against McGreal violated McGreal's First Amendment rights. See id. A corollary concern is that public services suffer when aggrieved employees bring suits to vindicate First Amendment claims. Such suits are costly to the government and expose the plaintiff's superiors to possibly unindemnified liability. See Wales, 120 F.3d at 85; see also Ameritech Corp. v. McCann, 297 F.3d 582 (7th Cir. 2002) (noting that "'a victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him.'") (quoting Kentucky v. Graham, 473 U.S. 159, 167-68 (1985)). Qualified immunity is a means of encouraging sound government employee management by reducing these costs and exposures. See Wales, 120 F.3d at 85. In the full view of the facts of this case, the law did not clearly prohibit Chief Wood and Lt. Snooks from taking the complained of actions against McGreal.

Chief Wood and Lt. Snooks faced a situation where McGreal, a patrol officer, was making serious accusations of misconduct against the mayor, police officers, prosecutors, and a judge, all of which proved to be false alarms. The rumor of Mayor Andrews being on the take turned out to be just that - a rumor that was unsupported by any fact. McGreal's statements to the press about Sgt. Murray's misfiled Copa reports were overstated, as Lt. Snooks found Sgt. Murray's reports properly filed. As for McGreal's Judicial Inquiry Board complaint about Judge Sterba, McGreal incorrectly inferred that Taylor's sentence had been changed after McGreal started following up on the case.

---

[2]The court's denial of Chief Wood and Lt. Snooks' first motion for summary judgment considered this step of the qualified immunity analysis too broadly. (See R. 73.) As Saucier makes clear, the second step is a fact specific inquiry instead of a general examination of the law. 121 S. Ct. at 2156.

McGreal also conducted an unofficial investigation into the ownership of the Copa, and led A.G. Feldmeier to believe that he was working in an official capacity. Chief Wood and Lt. Snooks were of the opinion that McGreal was threatening the relationships between the Alsip Police Department and other law enforcement agencies, prosecutors, and judges.

On these facts, Chief Wood and Lt. Snooks could reasonably believe that they could take action against McGreal without violating his First Amendment rights. McGreal does not point to any case with similar facts demonstrating that the law was clearly established in his favor. Instead, McGreal states generally that the law concerning governmental employees' First Amendment rights is well settled, and that government employers may not retaliate against employees for exercising their First Amendment rights. That much is true, but it is not enough to place Chief Wood and Lt. Snooks on notice that their handling of *McGreal's* case was illegal. Indeed, the well established law is that police departments have the authority to discipline officers whose speech threatens to disrupt the important mission of law enforcement. See e.g. Kokkinis, 185 F.3d at 645-46 (and cases cited therein). Faced with the repeated conduct of McGreal acting in a manner that was potentially disruptive of the Alsip Police Department, Chief Wood and Lt. Snooks were not on notice that disciplining McGreal was unconstitutional. Accordingly, both individual Defendants are entitled to the defense of qualified immunity.

### III.  CONCLUSION

For the foregoing reasons, the court grants summary judgment in favor of Kenneth Wood and David Snooks in their individual capacities as to all of Plaintiff's claims.

IT IS SO ORDERED.

ENTER: _____

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: ___8/21/02___